Filed 1/22/25  P. v. Chapman CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063202 |
| v. | (Super. Ct. No. 23WF1445) |
| CHRISTOPHER SCOTT CHAPMAN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Larry Yellin, Judge. Affirmed.

Paul R. Kraus, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

We appointed counsel to represent Christopher Scott Chapman on appeal. Counsel filed a brief that set forth the facts of the case. Counsel did not argue against his client but advised the court no issues were found to argue on Chapman's behalf.

Counsel filed a brief following the procedures outlined in *People v. Wende* (1979) 25 Cal.3d 436. The court in *Wende* explained that a *Wende* brief is one that sets forth a summary of proceedings and facts but raises no specific issues. (*Id.* at p. 438.) Under these circumstances, the court must conduct an independent review of the entire record. (*Ibid.*) When the appellant himself raises specific issues in a *Wende* proceeding, we must expressly address them in our opinion and explain why they fail. (*People v. Kelly* (2006) 40 Cal.4th 106, 110, 120, 124.)

Pursuant to *Anders v. California* (1967) 386 U.S. 738, to assist the court with its independent review, counsel provided the court with information as to issues that might arguably support an appeal. (*Id.* at p. 744.) Counsel raised four issues: (1) Did the trial court err when it concluded that the hung-jury reason the prosecution offered for using a peremptory challenge to Juror No. 147 was not presumptively invalid under Code of Civil Procedure section 231.7, subdivision (e)(1)? (2) Did the court err when it found that the prosecution's exercise of a peremptory challenge as to Juror No. 147 was for race-neutral reasons within the meaning of Code of Civil Procedure, section 231.7? (3) Was there substantial evidence to support Chapman's conviction for robbery (Pen. Code, §§ 211, 212.5, subd. (c))?[1] (4) Was there substantial evidence to support the true finding on the personal use enhancement (§ 12022, subd. (b)(1))? We gave Chapman 30 days to file

[1] All further statutory references are to the Penal Code.

written argument on his own behalf. Thirty days passed, and Chapman did not file any written argument.

We have reviewed the record in accordance with our obligations under *Wende* and *Anders*, and we found no arguable issues on appeal. We affirm the judgment.

FACTS

Chapman was charged with one felony count of second degree robbery (§§ 211, 212.5, subd. (c); count 1) and one felony count of making criminal threats (§ 422, subd. (a); count 2). The information also alleged as to both counts an enhancement for personal use of a deadly weapon (§ 12022, subd. (b)(1)). It further alleged an April 19, 2019, conviction for first degree burglary both as a prior serious felony conviction (§ 1192.7, subd. (c)) and as a strike conviction (§§ 667, subds. (d), (e)(1); 1170.12, subds. (b), (c)(1)).

A jury found Chapman guilty of second degree robbery and not guilty of making criminal threats and found true an enhancement for personal use of a deadly weapon. The trial court granted Chapman's motion to bifurcate the trial on the prior conviction, and Chapman waived his right to a jury trial on the prior conviction. The court found the prior conviction true and found that it was both a serious felony conviction and a strike conviction. The court sentenced Chapman to a total term of three years in state prison: the lower term of two years for robbery, plus one year for the personal use of a deadly weapon enhancement. The court struck the prior conviction both as a serious felony and as a strike.

On May 2, 2023, an Asset Protection Specialist (APS) was stationed at the outside garden center at Walmart in Huntington Beach. (APS's are also known as door hosts.) The APS's job involved checking receipts and merchandise as people entered and exited the store. Chapman

3

walked toward the garden center exit wearing a large straw hat with a tag on it. The APS was approximately 35 feet from Chapman at that time. When Chapman was "approximately a hand's length away" from the APS, the APS asked Chapman several times if he had a receipt for the hat. Chapman did not make eye contact with the APS. After the APS asked Chapman a third time for a receipt, Chapman looked up and handed the APS the hat with his left hand. At that point, the APS noticed Chapman had a machete. When the APS asked if Chapman had a receipt for the machete, without looking at the APS, Chapman raised the machete up to waist level in front of himself and turned it to let the APS see it. As he was doing this, Chapman replied, "No." He then looked at the APS and said, "I will stab and cut you," as he was exiting the garden center. The APS backed away from Chapman and let him walk out the door.

The APS testified that when Chapman raised the machete after being asked if he had a receipt, the APS used his radio to alert others that he was being threatened. The APS described being scared for his life as Chapman was leaving because he thought Chapman was going to come back.

Chapman did not point the machete at the APS, nor did he try to swipe the machete at the APS. Chapman did not walk directly toward the APS, did not try to push or hit the APS, or make contact with the APS's body. The APS explained he did not back away from Chapman because he did not want to give Chapman the room to swing the machete at him. Surveillance video of the incident was played for the jury. The APS testified the video was a fair and accurate depiction of the incident.

An asset protection investigator (the investigator) testified he was working in plain clothes on the day of the incident. His responsibilities involved watching to make sure that no one was concealing or walking out

4

with items, that merchandise was properly locked up, that everything was accounted for, and that self-checkout and door hosts had everything they needed.

Prior to being called to the garden center, the investigator saw Chapman pick up a watch from a store shelf and put it into his pocket. The investigator asked Chapman if he was going to pay for it, and Chapman ignored him and kept walking. The investigator did not follow Chapman because the investigator was watching a case with valuable items, which had a broken lock. He was waiting to have the lock fixed.

Several minutes later, the investigator received a radio call from the APS in the garden center. The APS indicated he needed help at the garden center immediately. When he arrived at the garden center, the investigator's attention was directed to a male walking through the parking lot. The investigator had previously called 9-1-1 and had been told to keep an eye on the subject, and the investigator did. The investigator observed the police contact the subject and observed the subject throw a machete over the wall. The investigator later identified the subject from surveillance video as Chapman and identified Chapman as the man he saw taking the watch from a store shelf. The investigator also identified Chapman on the Walmart surveillance footage taking an Angels T-shirt.

Officer Christopher Pichedwatana was a police officer with the Huntington Beach Police Department. On the day of the incident, he was on patrol by himself when he received a call for service at the Walmart regarding a man with a weapon who had threatened the door host. When he arrived at the Walmart, he met with the APS. Approximately 15 minutes later, he received information Chapman was in custody at a motel parking lot

5

near the Walmart. Pichedwatana did an in-field show-up, during which the APS identified Chapman as the person who threatened him with a machete.

At the time of his arrest, Chapman had in his possession an Angels T-shirt, a white hat, gloves, a watch, and a machete. The investigator met with police and identified the gloves, the machete, the watch, and the Angels T-shirt as belonging to Walmart. The police brought the machete back to the store where the APS identified it as the one Chapman had.

Later that day, Pichedwatana conducted an interview with Chapman at the Huntington Beach Jail. Pichedwatana recorded the interview on his body-worn camera. During the interview, Chapman admitted to taking the shirt, two pairs of socks, the watch, the machete, and the hat from Walmart. He told Pichedwatana he was homeless and explained why he needed each of the items. He admitted he was not planning to pay for the items. He admitted ignoring the investigator when the investigator asked him if he was going to pay for the watch. He said that after getting the items, he walked toward the garden center and left from there.

Chapman described giving the hat to the APS when the APS asked about having a receipt for it. He said he needed the machete because people were harassing him. Chapman denied threatening the APS and denied saying he was going to cut him.

During jury voir dire, Juror No. 147 indicated she sat previously on a jury and that jury was unable to reach a verdict. The juror indicated it was frustrating that the jury did not reach a verdict. Although she claimed that she was not left with a negative view on the jury process and that the experience would not affect her ability to work collaboratively and sit as a juror if she were selected, she said she was "not anticipating getting in the room again to deliberate."

The prosecution exercised a peremptory challenge when Juror No. 147 was seated. The defense objected under the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 1–5). The trial court noted that the juror appeared to be an African-American woman and both counsel agreed. Defense counsel indicated his objection was on the basis of race. The prosecutor explained the juror had sat on a hung jury and talked about the experience as being extremely frustrating. He said he does not tend "to keep . . . jurors that sat on hung juries." He added that the juror's charity work with transients and the homeless population was a concern. The prosecutor noted Chapman was a Caucasian man. Defense counsel noted the juror had said she would not let the hung jury experience affect her in this case and she would not let her work with the homeless affect her ability to be fair in this case. The juror also commented that if the evidence proved Chapman was guilty, she would vote guilty.

The trial court granted the peremptory challenge and indicated its reasons. The court said it would not consider Juror Number No. 147's charity work in granting the peremptory challenge. It found the hung-jury issue to be a valid race-neutral factor and granted the peremptory challenge. Defense counsel responded by indicating he felt the hung-jury issue should be treated as a "negative experience with the legal system" and be presumed invalid. The court responded that it believed the factor of negative experience with the legal system "really focuses on . . . street interactions with cops or interactions with lawyers as opposed to fellow jurors."

DISCUSSION

We have reviewed the information provided by counsel and have independently examined the record. We found no arguable issues. (*People v. Wende, supra*, 25 Cal.3d 436.)

7

DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


MOTOIKE, J.


DELANEY, J.